UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY CO., ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | CASE NO. 2:10-CV-2557-SLB |
| JEFFERSON IRON AND METAL BROKERAGE, INC., ) ) ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on the parties' cross Motions for Summary Judgment. (Docs. 16 and 17.)[1] Plaintiff, Norfolk Southern Railway Co., has sued defendant, Jefferson Iron and Metal Brokerage, Inc., for failure to pay rail carrier storage charges and breach of contract. (*See generally* doc. 1.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that plaintiff's Motion for Summary Judgment, (doc. 17), is due to be granted and defendant's Motion for Summary Judgment, (doc. 16), is due to be denied as moot.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*,

369 U.S. 654, 655(1962)(per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In this case the parties have filed cross motions for summary judgment.

> Cross motions for summary judgment may be probative of the nonexistence of a factual dispute.  *Bricklayers, Masons and Plasterers International Union v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975).  Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment.  Where, as here, however, the parties disagree as to the facts and take inconsistent legal theories the mere filing of cross motions for summary judgment does not warrant the entry of such judgment.  *Vetter v. Frosch*, 599 F.2d 630, 632 (5th Cir. 1979); *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir. 1978); *Bricklayers, Masons and Plasterers Union v. Stuart Plastering Co.* at 1023.

*Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

## II. STATEMENT OF FACTS

The following facts set forth in plaintiff's Motion for Summary Judgment are undisputed:

1. Jefferson is a scrap metal broker.  [(Doc. 16 at 2.)]

2. Jefferson regularly purchases scrap metal from ACIPCO.  [(*See id.*)]

3. On July 8, 2009, Jefferson entered into a purchase contract with ACIPCO to purchase shredded scrap metal from ACIPCO.s facility in North Birmingham, Alabama. [(*See id*.)]

4. In July 2009, Jefferson arranged for Norfolk Southern to transport loaded railcars from Norfolk Southern's North Birmingham rail yard to its rail yard in Arbela, Mississippi, at which point the cars would be delivered to Severstal Columbus, LLC ("Severstal"). [(*See id*. at 3.)]

5. Jefferson provided all shipping and routing instructions to Norfolk Southern. [(*See id*.)]

6. The bills of lading list Jefferson as the Shipper and Severstal as the Consignee. [(*See id*. at 4; *see also* doc. 17-3.)]

7. ACIPCO loaded twenty-two railcars with the shredded scrap metal purchased by Jefferson. (*See* doc. 16 at 4; *see also* docs. 17-3, 17-4, and 17-7.)]

8. Of the twenty-two railcars, nineteen were owned by Jefferson and three by Norfolk Southern. *See* doc. 16 at 4; *see also* docs. 17-3, 17-4, and 17-7.)]

9. Jefferson does not own or control track on which it can store its private railcars. [(*See* doc. 17-15 at 28-29.)]

10. Norfolk Southern transported all 22 railcars to Severstal's facility in Arbela, Mississippi. [(Doc. 16 at 4; *see also* doc. 17-3.)]

11. After Severstal unloaded the scrap metal that it had purchased from Jefferson, Norfolk Southern reverse-routed the cars, pursuant to the applicable tariff, back to its North Birmingham rail yard. [(*See* doc. 16 at 4; *see also* doc. 17-4.)]

12. Jefferson is the named consignee on the waybills for the reverse movements to Norfolk Southern's rail yard. [(*See* doc. 17-4.)]

13. Rail Inc Tariff RIC 6007-N ("RIC Tariff"), Item 540(1)(B), provides that:

4

> When a car is released from load on NS ["Norfolk Southern"], the empty car will be returned without charge *to the origin station of the last loaded movement via the reverse of the inbound route*. If the owner or lessee of the car desires movement of the empty car via a different route or station other than the last loaded movement, owner or lessee can enter advance empty disposition using the NS internet application while railcar is under load.

[(*See* doc. 17-12 [emphasis added].)]

> 14. Norfolk Southern's Conditions of Carriage and Demurrage Tariff specifically incorporate the RIC Tariff. [(*See* doc. 17-1 at ¶ 15; *see also* doc. 17-13 at 2; doc. 17-14 at 5.)]

> 15. Jefferson provided no instructions to Norfolk Southern as to where Jefferson's railcars should be moved after delivery to Severstal. [(*See* doc. 17-1 at ¶ 16; *see also* doc. 17-15 at 25-26.)]

> 16. The reverse-routed cars owned by Jefferson arrived at Norfolk Southern's North Birmingham rail yard on August 3, 10 and 21, 2009. [(*See* doc. 16 at 5; *see also* doc. 17-7.)]

(Doc. 17 at 2-5 [footnotes omitted].)

Plaintiff sent ACIPCO, rather than defendant, Constructive Placement Letters, which notified ACIPCO that the railcars were "available for placement."[2] (Doc. 16-6.) No letters were sent to defendant at this time, despite the Shipping Instructions and Bill of Lading showed defendant's mailing address. (Doc. 17-3.) The empty railcars remained in plaintiff's Birmingham rail yard until December 2009. (Doc. 4-2.)

---

[2]These letters, which identified the railcars by number, stated, "You are hereby notified the following cars consigned to, or ordered by your company are now available for placement and tender is hereby made in accordance with Tariff NS 6004-C." (Doc. 16-6.)

Within five days of the cars' arrival, defendant knew its cars were in Birmingham. (Doc. 16-1 at 36.)[3] During the relevant time period, defendant monitored the movement of its rail cars through a running electronic trace report from Steelroads. (*Id.* at 22-24.) Plaintiff has submitted evidence that the report showed two of defendant's cars were constructively placed in Norfolk Southern's North Birmingham rail yard on August 10, 2009, and one of its cars was constructively placed there on August 21, 2009. (Doc. 17-5 at 2, 6, 11; doc. 17-6 at 3.) Damon Deese, plaintiff's Manager of Revenue Accounting Customer Service, testified, "Because of the volume of railcar tracing information for the relevant time period," plaintiff submitted "a representative sample of the tracing information available to Jefferson (using the three Jefferson railcars with the highest car numbers). Identical information would have been available to Jefferson for all 19 railcars at issue." (Doc. 17-1 ¶¶ 2, 19.)

The following facts are deemed undisputed:[4]

> 19. Steelroads is a concurrent service of, inter alia, Norfolk Southern and the Association of American Railroads, and provides private railcar tracing information to the owners of those private railcars. [(Doc. 17-1 ¶¶ 21-22.)]

---

[3]Citation to deposition pages reflects the page number of the original deposition and not the page number of the travel transcripts filed with the court or the page assigned to the document in the court's CM/ECF electronic filing system.

[4]Defendant disputed these facts by stating, "Jefferson does not dispute that it knew that its cars were in north Birmingham. However, Jefferson disputes any implication that this knowledge constituted 'notice' as defined in the Tariff." (Doc. 22 at 3-4.) Defendant did not cite to any record evidence. Therefore, according to Exhibit A to the Scheduling Order, these facts are deemed admitted. (Doc. 15-1 at 4.)

>       20.  The information available to the railcars['] owner in a Steelroads tracing report for private railcars on Norfolk Southern track is populated with identical tracing information provided by Norfolk Southern.  [(*Id*. at ¶¶ 21-25.)]
>
>       21.  Steelroads tracing reports are accessible at www.steelroads.com and via the Norfolk Southern's AccessNS service.  [(*See id*. at ¶ 22.)]
>
>       22. Jefferson has maintained a user account with Norfolk Southern's AccessNS service since prior to the freight movements at issue in this litigation.  [(*See id*. at ¶ 18.)]
>
>       23. Norfolk Southern assigned Jefferson Iron and Metal a unique user id . . . which allows Norfolk Southern to identify when Jefferson logs into AccessNS, and allows Norfolk Southern to record when Jefferson obtains tracing reports for its private railcars.  [(*See id*. at ¶ 19.)]
>
>       24. Norfolk Southern's AccessNS records show that Jefferson utilized Norfolk Southern's AccessNS tracing service for the railcars at issue in this litigation at the time they were accruing storage charges.  [(*See id*.)]

(Doc. 17 at 5-6.)

Defendant's employee responsible for transportation, Tyler Erwin, testified that he was aware the cars were in Birmingham within five days of their arrival based on the report; however, the report did not tell him where in Birmingham his cars were.  (Doc. 16-1 at 36.)  He testified the cars could have been in five or six places.  (*Id*. at 38.)  He testified he never received notice from plaintiff that it was about to start charging defendant storage charges for its cars.  (*Id*. at 66-67.)   According to Deese, whether the cars were actually placed is shown on the trace reports, and nothing on the trace reports indicates that the cars actually left plaintiff's tracks.  (Doc. 17-1 ¶¶ 27-28.)

Plaintiff's Freight Tariff NS 6004-C ["Freight Tariff] provides, "Loaded Private Cars and empty Private Cars held on NS tracks under constructive placement after notice of arrival is given to the Consignee or Consignor" are subject to demurrage or storage charges. (Doc. 17-14 at 9.) A "Private Car" is "a car bearing other than railroad reporting marks." (*Id*. at 6.) The parties do not dispute that defendant's cars were "private cars" or that the cars were held on plaintiff's tracks. A "constructive placement" is defined as, "When a car cannot be actually placed because of any condition attributable to the Consignor or Consignee, such car will be held at an available hold point and notice will be given to the Consignor or Consignee that the car is held awaiting instructions." (*Id*. at 6.) The tariff provides that notice may be sent by electronic means, which is defined as, "Any approved electronic device (i.e. AccessNS, email, telephone, facsimile) used to communicate to CYO[5] the disposition of a car." (*Id* at 6, 7 [footnote added].) According to the tariff, "When the Consignor or Consignee utilizes an electronic or mechanical device (either in written, oral, or keyed data form) notification left on such device will be considered as having been given to Consignor or Consignee, as of the date and time transmitted." (*Id*. at 7.) Erwin testified that he was not aware that the bill of lading incorporated other documents, such as the applicable tariffs. (Doc. 16-1 at 57-58.)

---

[5]CYO stands for centralized or central yard operations. *See* Norfolk Southern's Customer Reference Guide: Local Handling – Centralized Yard Operations (CYO) at http://www.nscorp.com/nscportal/nscorp/Customers/Customer%20Reference%20Guide/localhandling.html.

Deese testified that plaintiff's policy is "to treat a third party as an agent of the shipper *if* that third party tenders the shipper's freight to [plaintiff] at the third party's own facility." (Doc. 17-1 ¶ 31 [emphasis in original].) Therefore, plaintiff billed ACIPCO a daily fee of $60 per day for each empty railcar after notifying ACIPCO by Constructive Placement Letters. (Doc. 4-1 at 15; doc. 4-2; doc. 10-1.) According to plaintiff, the total amount of storage charges is $126,660. (Doc. 17-1 ¶ 12; doc. 17-8.)

In response to plaintiff's bills, ACIPCO's Traffic Manager, Jim Bragan, sent plaintiff an email, which stated:

> [ACIPCO] is receiving invoices for Private cars owned by Jefferson Iron & Brokerage.  Jefferson Iron & Brokerage has private cars spotted into [ACIPCO] for purchasing shredded scrap[;] the cars are released upon loading and billed to Consignee by Jefferson Iron & Brokerage.  If and when the cars are utilized again Jefferson Iron & Brokerage is controlling the movement of their private cars[,] not [ACIPCO].
>
> . . .
>
> Please review the invoices and have all charges removed from [ACIPCO's] billing and responsibility for any Private railcars owned by other parties. Further please implement procedures to keep this type [of] billing from occurring in the future.

(Doc. 10-1.)

As a result of ACIPCO's missive, plaintiff billed the storage charges to defendant. Defendant objected to the charges and sent plaintiff the following email:

> Jefferson Iron & Metal does not feel that we are responsible for the bills due to the fact that we were never notified of the accruing demurrage/storage charges nor were we ever notified that there was such a tariff in place.  We have been operating our own private rail car fleet for 8 years now and have

9

>never received a demurrage or storage fee. In the past, if any of our cars were in threat of storage fees or being in need of disposition due to becoming idle, I was always contacted by a member of the CYO desk via email or [a] phone call. . . . In the future I can agree to the accruing of such charges once we are aware that they exist. We do not however agree to these charges accrued from last August [until] December and were not aware of them until we were contacted by [ACIPCO,] who originally was the billed party in February. . . . Due to the fact that we had no knowledge of the tariff, Jefferson Iron & Metal is disputing these charges and request[s] the removal of them from our account immediately.

(Doc. 10-6.) To date defendant has not paid the storage charges.

On September 20, 2010, plaintiff filed the instant action, seeking recovery of the storage charges. (*See generally* doc. 1.)

### III. DISCUSSION

Pursuant to 49 U.S.C. § 10746 –

>A rail carrier providing transportation subject to the jurisdiction of the Board under this part shall compute demurrage charges, and establish rules related to those charges, in a way that fulfills the national needs related to –
>
>>(1) freight car use and distribution; and
>>
>>(2) maintenance of an adequate supply of freight cars to be available for transportation of property.

49 U.S.C. § 10746. "The right to assess detention or demurrage charges against parties to a transportation contract for delay in releasing transportation equipment is well established at common law. Motor carriers term such a delay as detention while rail carriers refer to it as demurrage." *Norfolk Southern Ry. Co. v. Groves*, 586 F.3d 1273, 1276 (11th Cir. 2009). "[D]emurrage charges serve a twofold purpose: 'One is to secure compensation for the use

10

of the car and of the track which it occupies. The other is to promote car efficiency by providing a deterrent against undue detention.'" *Groves*, 586 F.3d at 1276 (quoting *Turner, Dennis & Lowry Lumber Co. v. Chicago, Milwaukee & St. Paul Ry. Co.*, 271 U.S. 259, 262 (1926)). "While demurrage remains a matter of contract, railroads are now ***required*** by federal statute to assess demurrage charges subject to oversight by the Surface Transportation Board." *Id*. (emphasis added). "[D]emurrage charges are properly assessed even if the cause for the delay is beyond the party's control, unless the carrier itself is responsible for the delay." *Id*.

> Demurrage is properly assessed in accordance with the terms of a tariff even though the detention occurs through no fault of the consignee, for a cause that is beyond the consignee's control . . . . The assessed party may be relieved of liability ***only*** if (1) a specific provision of the tariff exonerates the consignee from liability for demurrage; (2) the delay is the fault of the carrier or those for whom it is responsible; or (3) the delay is caused by a vis major.

*Consolidated Rail Corp. v. Nevins-Petrillo Warehouse & Distribution Systems, Inc.*, 619 F. Supp. 900, 904-05 (S.D.N.Y. 1983)(quoting *City of New Orleans v. Southern Scrap Material Co.*, 491 F. Supp. 46, 48 (E.D. La. 1980))(emphasis added).

> Tariffs filed with the ICC are binding contracts between the carrier and the shipper. *See Great N. Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291 (1922); *Penn Central Co. v. General Mills, Inc.*, 439 F.2d 1338 (8th Cir. 1971). They have the force of law and are treated with the same import as statutes. *Illinois Cent. Gulf R.R. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir. 1978). The task of interpretation of tariffs filed with the ICC is akin to the task of statute interpretation, and like statutory interpretations, tariff interpretations involve mainly questions of law.

*Coca-Cola Co. v. Atchison, T. and S. F. Ry. Co.*, 608 F.2d 213, 219 (5th Cir. 1979).[6] When construing a tariff, the court "generally" uses "the ordinary rules of contract interpretation." *Alabama State Docks Dept. v. Bunge Corp.*, 655 F.2d 64, 66 (5th Cir. Unit B Sept. 1981).

Earlier in this litigation, defendant moved to dismiss plaintiff's claim for demurrage charges on the ground that it had not received notice as required by plaintiff's tariff. In response, plaintiff argued that the notices sent to ACIPCO satisfied the tariff's notice requirement because ACIPCO was defendant's agent. In noting the record contained insufficient evidence that ACIPCO was defendant's agent, the court allowed the parties to conduct limited discovery. Following this discovery period, the parties filed cross motions for summary judgment. Defendant contends that plaintiff cannot prove that ACIPCO was defendant's agent for purposes of receiving notice; plaintiff contends that defendant received notice through electronic means.

With regard to defendant's Motion for Summary Judgment, plaintiff asserts:

> As set forth in Norfolk Southern's cross motion for summary judgment, Jefferson's own corporate representative testified that Jefferson had actual notice, within five days of arrival, that each of its 19 railcars had been returned to North Birmingham, and were occupying Norfolk Southern track. Accordingly, it is no longer necessary to delve into the thicket of agency law to resolve this matter, and Jefferson's motion must be denied accordingly.

(Doc. 18 at 13.) The court agrees.

---

[6]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

Plaintiff contends that it is entitled to judgment as a matter of law because the undisputed evidence shows that defendant had actual knowledge of the constructive placement of its cars through the electronic tracing reports. Defendant contends that its use of a tracing report, detailing its rail cars were returned to "North Birmingham" is insufficient under the terms of the tariff to constitute notice. Specifically, defendant contends that plaintiff was required to provide it notice that each "car is held awaiting instructions." (*See* doc. 17-14 at 6.)

The tariff provides that demurrage charges apply to "empty Private Cars held on NS tracks under a constructive placement after notice of arrival is given to the . . . Consignor." (Doc. 17-14 at 9.) Defendant received notice of arrival shortly after the cars were returned to North Birmingham. Although defendant has provided evidence that it did not realize the cars had been returned to plaintiff's rail yard, the court finds defendant is charged with constructive knowledge that the cars had been returned to plaintiff's rail yard pursuant to the RIC Tariff. The RIC Tariff provides empty cars are returned to "the origin station of the last loaded movement" unless other instructions are provided. (Doc. 17-2.) The evidence is undisputed that defendant did not give plaintiff any instructions regarding the placement of the empty cars. Erwin testified that he was unaware of the contents of numerous tariffs applicable to defendant's shipment. However, "[t]he [Supreme] Court has held that shippers are conclusively presumed to know the filed tariffs applicable to their shipments." *Louisville and Nashville R. Co. v. Mead Johnson & Co.*, 737 F.2d 683, 689 (7th Cir. 1984)(citing

13

*Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink*, 250 U.S. 577, 581 (1919); *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 97-98 (1915); *Kansas City Southern Railway Co. v. Carl*, 227 U.S. 639, 653 (1913); *Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619, 621-22 (7th Cir. 1979))*; see also A. P. Moller-Maersk v. Taiwan Glass USA Sales* (Orp., 663 F. Supp.2d 1011, 1016 (D. Or. 2009)(citing *Sea-Land Service v. Murrey & Son's Co. Inc.*, 824 F.2d 740, 742 (9th Cir. 1987)).

  The Freight Tariff defines "constructive placement" as "When a car cannot be actually placed because of any condition attributable to the Consignor . . . , such car will be held at an available hold point and notice will be given to the Consignor . . . that the car is held awaiting instructions." (Doc. 17-14 at 6.) Defendant argues that this definition of "constructive placement" requires plaintiff to provide notice to defendant that its cars were being held "awaiting instructions" regarding their placement. (Doc. 22 at 17.) The question for the court seems to be whether the cars were "constructively placed" if plaintiff did not notify defendant that the cars were being "held awaiting instructions" regarding their placement.

  Plaintiff has provided a sample of the information available to defendant through Steelroads, which shows that defendant had actual notice that three of the cars at issue were "PCON" or "placement constructive – on August 10, 2009 and August 21, 2009. (Doc. 17-5 at 2, 6, 11; doc. 17-6 at 2.) Therefore, the court finds that defendant had notice of the status of its cars as constructively placed, which, under the terms of the Freight Tariff, included any

notice of the cars "being held awaiting instructions." This information is sufficient to provide notice to defendant of the constructive placement of its cars and to start the clock running on storage charges until the cars were actually placed. The fact that defendant chose not to act on this information immediately, awaiting written notice of the type sent to ACIPCO, does not negate defendant's liability for the demurrage charges.

The court finds that defendant is liable for the demurrage charges on the three cars set forth in plaintiff's Exhibit C. Defendant does not dispute the fact that it had identical reports for the other 16 cars. Therefore, the court finds no disputed issue of fact as to whether defendant had notice of the arrival of its cars sufficient to start the accrual of demurrage charges until the cars were constructively placed. Moreover, defendant does not dispute the amount of the unpaid demurrage charges – $126,660.

The court finds that the material facts are undisputed and plaintiff is entitled to judgment as a matter of law in the amount of $126,660.

In light of the foregoing, the court finds that plaintiff's assertion that notice was provided to defendant through ACIPCO is moot. Therefore, defendant's Motion for Summary Judgment, (doc. 16), seeking judgment on the ground that notice to ACIPCO was inadequate, will be denied as moot.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 16), is due to be denied as moot, and plaintiff's Motion for

Summary Judgment, (doc. 17), is due to be granted. An Order denying defendant's Motion for Summary Judgment, (doc. 16), and an Order granting plaintiff's Motion for Summary Judgment, (doc. 17), and entering judgment in favor of plaintiff will be entered contemporaneously with this Memorandum Opinion.

  **DONE**, this 16th day of March, 2012.

                _Sharon Lovelace Blackburn_
                SHARON LOVELACE BLACKBURN
                CHIEF UNITED STATES DISTRICT JUDGE